## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| BRADLEY GUST, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) **CIVIL ACTION** |
| v. | ) |
| | ) **No. 15-2646-KHV** |
| WIRELESS VISION, L.L.C., et al., | ) |
| | ) |
| **Defendants.** | ) |
| _____ | ) |

## <u>MEMORANDUM AND ORDER</u>

Bradley Gust brings suit against Wireless Vision, L.L.C. for retaliatory discharge in violation of public policy under Kansas law.[1]  This matter is before the Court on <u>Defendant's Motion For Summary Judgment</u> (Doc. #73) filed March 9, 2016.  For reasons stated below, the Court overrules defendant's motion.

### I.    Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Hill v. Allstate Ins. Co.</u>, 479 F.3d 735, 740 (10th Cir. 2007).  A factual dispute is "material" only if it "might affect the outcome of the suit

---

[1]    Plaintiff also sued David Naas and Anthony Sawa and asserted claims for retaliatory discharge and violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 <u>et seq.</u>  <u>See</u> <u>[Amended] Complaint</u> (Doc. #15) filed May 19, 2015.  On May 18, 2015, the Court dismissed the retaliatory discharge claims against the individual defendants.  <u>See</u> <u>Memorandum And Order</u> (Doc. #13) at 12.  On February 19, 2016, plaintiff agreed to dismiss the FLSA claims.  <u>Joint Stipulation Of Dismissal With Prejudice</u> (Doc. #70).  Thus, plaintiff's only remaining claim is against Wireless Vision for wrongful discharge.  <u>See</u> <u>Pretrial Order</u> (Doc. #71) filed February 24, 2016 at 2.  The Court exercises diversity jurisdiction over the claim pursuant to 28 U.S.C. § 1332.  <u>See</u> <u>id.</u> at 3.

under the governing law." <u>Liberty Lobby</u>, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence in support of a party's position. <u>Id.</u> at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Nahno-Lopez v. Houser</u>, 625 F.3d 1279, 1283 (10th Cir. 2010). Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive matters for which the nonmoving party carries the burden of proof. <u>Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990); <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986). To carry this burden, the nonmoving party may not rest on the pleadings but must instead set forth specific facts supported by competent evidence. <u>Nahno-Lopez</u>, 625 F.3d at 1283.

The Court views the record in the light most favorable to the nonmoving party. <u>See Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.</u>, 938 F.2d 1105, 1110 (10th Cir. 1991). It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative. <u>See Liberty Lobby</u>, 477 U.S. at 250-51. In response to a motion for summary judgment, a party cannot rely on ignorance of facts, speculation or suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. <u>Conaway v. Smith</u>, 853 F.2d 789, 794 (10th Cir. 1988); <u>Olympic Club v. Those Interested Underwriters at Lloyd's London</u>, 991 F.2d 497, 503 (9th Cir. 1993). The heart of the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Liberty Lobby</u>, 477 U.S. at 251-52.

## II.     Facts

The following facts are uncontroverted, deemed admitted or construed in the light most favorable to plaintiff.[2]

Wireless Vision is an independent contractor and exclusive retailer for T-Mobile cellular phones in multiple states.  T-Mobile also sells its phones in T-Mobile corporate-owned stores.

From January of 2011 to August of 2014, Bradley Gust worked at a T-Mobile corporate-owned store in Olathe, Kansas.  Gust worked in sales operations.  His responsibilities included accounting for inventory, stocking the sales floor, ordering supplies and making sure that employees correctly processed and filed paperwork.

On August 4, 2014, Wireless Vision hired Gust to work as a retail sales associate at its store in Overland Park, Kansas (the "Overland Park store").  Wireless Vision agreed to pay $10.25 per hour plus a commission on sales.  The letter of engagement stated that for the first 90 days, Gust would serve as a probationary employee.[3]

David Naas served as store manager for the Overland Park store.  As store manager, Naas received a salary plus a sales commission.  As required under company policy, Naas gave his employees written performance reviews every month.

Anthony Sawa served as Wireless Vision regional manager over the Overland Park store.

---

[2]     The Court includes only those facts which are material to defendant's motion and disregards any facts which are not supported by record citations.  In addition, the Court disregards facts which the parties include only in the argument sections of their briefs and not in the statement of facts as required by D. Kan. Rule 56.1.

[3]     The Wireless Vision employee handbook states that for the first 90 days of employment, employees are probationary.  The record does not explain the difference between probationary and non-probationary employees.

Anthony Sawa's brother, Leith Sawa, also served as regional manager.  At least two or three times a week, Anthony Sawa visited the Overland Park store.  Naas primarily communicated with Anthony Sawa.

Austin Rodriguez served as sales team leader in the Overland Park store.  Sales team leaders, also called "floor coaches," have authority to assign duties, help train and coach employees and ensure that the store is running correctly.  Wireless Vision pays sales team leaders an hourly wage plus sales commission.

On August 11, 2014, Gust first reported to work.  Naas did not do much to train him.  Naas believed that since Gust had come from a T-Mobile corporate-owned store, he already knew the products.  Deposition of David Ephraim Naas at 48:14-18, 51:9-15, Exhibit 7 to Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment ("Plaintiff's Response") (Doc. #75).

At the beginning of Gust's employment, Anthony Sawa would ask how he liked working for Wireless Vision.  Gust would reply, "I absolutely love this place."  Deposition of Anthony Sawa at 21:1-20, Exhibit 15 to Plaintiff's Response (Doc. #75).  Gust loved his pay and commission and said that it was a much better place to work than his previous job.  Id. at 21:21-23.

Naas testified that Gust told him that Gust did not like to bundle products and/or services.  Naas Depo. at 85:25 to 86:3.  "Bundled sales" involved combining several products or services for which the customer would pay in monthly installments.  Bundling products or services did not always make them cheaper for customers.

During his employment with Wireless Vision, Gust witnessed consumer deception and was directed to engage in deceptive acts such as adding insurance on customer accounts without their

knowledge and ringing up accessories without advising that it would result in additional costs per month.  Gust Depo. at 164:4-15.  Five or six customers expressed dissatisfaction to Gust.  They complained about charges for insurance that they did not request and/or monthly accessory charges that they did not understand.  Deposition of Bradley Gust at 104:11 to 105:20, Exhibit 1 to Plaintiff's Response (Doc. #75).

At a meeting in September of 2014, Naas instructed Gust and other store employees to add features to customer accounts.  Naas said that if they did not do so, they would be "out the door." Gust Depo. at 111:20 to 112:3.  Naas told employees to "just make sure that [the features] were added."  Id. at 112:14-16.  Naas said that it would not be an issue if customers came back and questioned it, as they had been doing, because all employees had the same story.[4]  Id. at 112:4-8. Naas told employees to describe the product, not break down pricing and just add certain things such as insurance without discussing it with the customer.  Id. at 112:19 to 113:3.  Occasionally, Naas instructed them ring up high-dollar accessories such as Bluetooth wireless speakers, cases and car chargers without discussing them.  Id. at 113:8:17.

On September 18, Naas sent his employees a group text message which stated as follows: "Jump on every box.  4.5 gb attachment on any new."  Rodriguez Depo. at 46:6.  The employees were familiar with this terminology.  "Jump" referred to an insurance program which Wireless Vision offered customers on installment purchases.  "Box" meant a phone or other product. Rodriquez testified that he understood the message to mean that employees should offer Jump on every phone sold.  Rodriguez Depo. at 46:9-12.  In response to the message, Rodriguez texted the group: "Got it.  The money is the motive."  Id. at 46:25 to 47:3.

---

[4]        The record does not reflect what the "story" was.

In late September, Naas criticized Gust for not adding Jump to a customer account. Id. at 114:3-24. Naas watched Gust ring up the sale and afterward went over to review the account. Id. at 114:10-12. Gust explained that he had discussed insurance with the customer several times but the customer declined. Id. at 13-17. Naas asked, "Well, why don't you just add it on there anyway?" Id. at 114:23-24.

On September 30, Gust sent Anthony Sawa a text message which asked to speak with him. The same day, Anthony Sawa telephoned Gust. During the conversation, Gust reported that Naas was engaging in deceptive sales practices such as adding Jump or other products on customer accounts without their knowledge or consent and directing employees to do the same. Gust characterized the behavior as fraud.

Anthony Sawa did not report Gust's complaint to anyone in his chain of command. Company policy required that if a regional manager received a complaint of actual or potential wrongdoing, he report it to his superior, i.e. the director of sales. Denha Depo. at 23:19:23.[5]

Anthony Sawa testified as follows: The day after the text from Gust, on October 1, 2014, he went to the Overland Park store when Naas was not there. Anthony Sawa talked with three employees – Ana Lopez, Shawn Rattler and Austin Rodriguez – and asked whether anything fraudulent was going on in the store. Anthony Sawa Depo. at 52:10-23, 55:4-7; see also Defendant's Exhibit 12. The employees said "no" and Anthony Sawa performed a spot check audit to make sure that customers had signed their agreements. Id. at 55:10-22, 56:10:16. Anthony Sawa concluded that Gust's complaint was false. Id. at 79:16-19.

---

[5]     Mark Denha serves as Wireless Vision chief financial officer and testified as its corporate representative.

Gust disputes whether Anthony Sawa visited the store and/or investigated his complaint. Anthony Sawa could not have talked with Rattler because Rattler did not work in the store at that time.[6]  In addition, Rodriguez testified that (1) he does not remember Anthony Sawa coming into the store on October 1 and (2) Anthony Sawa never interviewed him and asked if he had seen anything fraudulent happening in the store.  Rodriguez Depo. at 49:1-9.[7]

Anthony Sawa told Gust that he had spoken with Naas and a couple of associates at the store and had addressed all of Gust's concerns.[8]  Gust Depo. at 125:17 to 126:3.  Anthony Sawa said that he could not believe that Naas would do the things that Gust had alleged.  Id. at 126:11-14.

On or about October 1, 2014, Anthony Sawa spoke with Naas about Gust.  During the conversation, Naas said that he wanted to fire Gust.  Anthony Sawa agreed with the decision. Anthony Sawa cannot remember any earlier conversations in which he and Naas discussed firing Gust.

On October 1, 2014, Naas sent Lauren Bowers Thomas, Wireless Vision human resources ("HR") generalist, an email which stated as follows:

> I have a new hire who is within the 90 day probationary period in which I am terminating:
> Reasons:
> 1) He does not listen to the team sales lead when given advice, talks down on other

---

[6]     Responding to this discrepancy, defendant asserts that Anthony Sawa was mistaken about Rattler's identity but remembers speaking with Lopez and another unidentified employee about Gust's complaints.  See Affidavit Of Anthony Sawa ¶¶ 8-9, Exhibit 5 to Defendant's Reply In Support Of Summary Judgment ("Defendant's Reply") (Doc. #77) filed April 15, 2016.

[7]     At his deposition, Rodriguez also testified that at some point, Anthony Sawa asked whether he had been instructed to put products on customer accounts without them knowing. Rodriguez Depo. at 60:11-14.  Rodriguez could not remember when the conversation occurred.  Id. at 60:15-16.

[8]     The record does not reflect when Anthony Sawa relayed this information to Gust.

employees and tells them how he knows more than all the market managers or everybody who works on the corporate side or branded.
2) He boast [sic] about how he has gotten his previous supervisors and coworkers fired from corporate.
3) He has not hit goal and does not get the leads or myself involved when a customer is about to walk.
4) Displays his attitude towards customers and coworkers.

His attitude and behavior towards the staff and company is [sic] unacceptable. He brings the moral [sic] of the store down and has a [sic] attitude every time he walks in. He is not a fit for our store or the company.

I have already gotten approval from Anthony & Leith Sawa to terminate him but I just wanted to clear the air and keep you in the loop with all decisions that involve termination. If there is anything I need to do before terminating him please let me know.

Exhibit 6 to Plaintiff's Response (Doc. #75).

At 6:00 p.m. on October 1, Thomas replied by email as follow: "Please let me know some details before we proceed.  Who is the associate?  When did he start?"  Deposition Testimony of Lauren Bowers Thomas at 36:21-23, Exhibit 5 to Plaintiff's Response (Doc. #75).  Naas supplied the requested information and Thomas approved the decision.  Id. at 38:2-19.

When Thomas gets involved in approving a termination, she ordinarily reviews all documents and circumstances to make sure that Wireless Vision has a basis to fire the employee. Thomas does not recall talking with Naas, Anthony Sawa or Leith Sawa or requesting any additional information before approving the decision to terminate Gust.  Id. at 36:25 to 37:9, 39:2-7.  The email from Naas on October 1 was the first time that HR had received anything negative about Gust from any member of management.  HR maintains personnel files which would include all corrective action forms.  Gust's personnel file contains no record of verbal, written or final warnings.

On October 2, 2014, Wireless Vision terminated Gust's employment.  Naas testified that he and Anthony Sawa met with plaintiff and told him that he was fired and that Thomas was on the

telephone at the time.  Naas Depo. at 107:3-25.  Gust asked for a reason for the termination but did

not receive one.[9]  Gust Depo. at 102:16-21.

At the time of termination, Gust refused to sign a termination document titled "Corrective

Action Warning."  Exhibit 21 to Plaintiff's Response (Doc. #75).  In part, the document stated as

follows:

> The first 90 days of your employment are considered a probationary period.  The
> primary purpose of this period is to provide you with an initial introduction to your
> role and Wireless Vision.  It also gives Wireless Vision an opportunity to make an
> initial evaluation of your performance, suitability for the job, reliability,
> cooperativeness, attitude, dependability and other factors.
>
> During this probationary period, there have been several behaviors that have been
> witnessed that do not meet company expectations.
>
> Despite the additional coaching/training that has been provided to Bradley Gust there
> has not been sustained improvement.
>
> Based on Bradley Gust [sic] recent lack of execution of company sales behaviors and
> sales performance his/her employment with Wireless Vision is being terminated
> effective immediately.

Id.[10]

Before October 2, Naas had not given Gust anything in writing which stated that his

performance was inadequate.  Wireless Vision used a computer program called "DSR" which

_____

[9]    Naas testified differently as follows:

We . . . talked about the actions leading up, the warnings that we gave him before
about his behavior, sending people to different stores to do upgrades when we could
have got the box and everything, and then how his behavior didn't change and how
his attitude has gotten worse.  And we didn't say much.

Naas Depo. at 107:12-18.

[10]    The document is typed; it appears that someone underlined the words
"cooperativeness, attitude."  Exhibit 21 to Plaintiff's Response (Doc. #75).

contained templates and forms on which store managers could issue employee discipline and corrective action. One form is entitled "Record of Conversation." A Record of Conversation is not discipline, but a way to record conversations and give employees a "head's up" regarding company expectations and/or employee performance. Naas knew about the Record of Conversation form and had previously used it with his employees. Another form is entitled "Corrective Action Warning." The Corrective Action Warning has options for recording (1) verbal warning, (2) written warning, (3) final warning and (4) discharge. The form refers to the actions as "progressive discipline." See Plaintiff's Exhibit 21. A store manager can issue a Corrective Action Warning without HR approval for a verbal warning or written warning. Naas had previously used the "Corrective Action Warning" form to issue and record verbal warnings to other employees.

Naas testified that because Gust was a probationary employee, he did not need to record anything about his performance. Id. at 96:11-19. On the other hand, Wireless Vision policy allows a store manager to record verbal and written warnings to probationary employees. Thus, nothing prohibited Naas from recording verbal warnings or issuing Gust a written warning and/or discipline during the probationary period.

Naas testified that customers complained about Gust's attitude. Naas Depo. at 95:6-11. Naas said that he discussed the complaints with Gust and told him that the customer is always right and that Gust needed to change his behavior and treat customers with respect. Id. at 95:13-17. Naas did not notify the district manager or document the complaints. Id. at 96:3-19. In response to plaintiff's interrogatory whether defendant had received complaints about Gust from customers, defendant stated, "There are no known complaints made by customers." Defendant's Second Supplemental Answers To Plaintiff's First Interrogatories at 3 (answer to question 5), Exhibit 18 to

Plaintiff's Response (Doc. #75).

Naas testified that employees complained about Gust's attitude. Naas Depo. at 98:22 to 99:6. Naas said that he had discussed the complaints with Gust but had not documented them. Id. at 99:2-9, 100:10-13.

Naas testified that Gust was insubordinate and walked away from a coaching session and left the store in the middle of a conversation with a sales team lead. Id. at 115:7-11. Naas said that he approached Gust about the situation but did not document it. Id. at 116:20-24.

Naas and Rodriguez testified that Gust sent customers to competitors, i.e. stores that were not owned and operated by Wireless Vision.[11] Id. at 118:2-18; Rodriguez Depo. at 56:20 to 58:3. Naas did not issue written discipline, however, or document the behavior. Naas Depo. at 120:9-14. Wireless Vision knows no facts which support its claim that Gust sent customers to competitors.

---

[11]     Depending on the circumstances, a T-Mobile corporate store could be considered a competitor of Wireless Vision. Denha Depo. at 67:18-23. Denha testified as follows:

> If we can somehow take care of the customer. I mean, if there's a way we can – you know, if we're out of a product, we can, overnight it to their house versus sending them there, because we don't get paid for that. So I guess you could consider that a competitor. I'd say under – under most circumstances. I would say that T-Mobile corporate store can be considered somewhat of a competitor to us.

Id. at 67:21 to 68:8.

It was sometimes appropriate, however, for a Wireless Vision employee to send a customer to a T-Mobile corporate store. Denha testified as follows:

> So let's say we're – we don't have a phone, and a T-Mobile corporate store has a phone. I mean, our goal is to treat the customer right and if we have to send them to another, you know, T-Mobile store, I mean that can be acceptable. It's not something we promote. You know, we'd rather get the phone and do a follow-up or something like that.

Id. at 66:13-19.

Denha Depo. at 68:20 to 69:16.  If an employee was sending customers to a competitor, Wireless Vision would expect supervisors to discipline and document the behavior, especially if it happened more than once.  Id. at 65:24 to 66:7.

Gust denies that he ever recommended that customers go to a competitor's store.  Gust Depo. at 116:9-13.  If the Overland Park store was out of a particular product, Gust followed the following procedure which Naas established:

> [I]f we were out of a particular product, we were to call another store and see if we could obtain it; and then if we could, then one of us would go pick it up and bring it to our location to sell to the customer.  We could also try and sell the customer the item from our website, through our shipping system and then just have it sold there in the store then ship it to the customer. . . . If that failed, then we could – and the customer did not want to wait for either one of those options, then I would recommend they go to a different Wireless Vision store.

Id. at 115:15 to 116:6.

Shortly after his discharge, Gust filed with T-Mobile an Integrity Hotline Report which alleged that Naas was engaged in fraudulent activities.  Sean McCloskey, T-Mobile national account manager for Wireless Vision, instructed Wireless Vision to conduct a three-month audit on the Overland Park store and "check all operations, activations, features, and commission submissions."  Denha Depo. at 43:14-20.  A three-month audit would require Wireless Vision to look at every transaction in the store during the time in question.

Wireless Vision has no records of doing anything as a result of the hotline report.  If Wireless Vision had conducted a three-month audit, it would have recorded its findings. As Wireless Vision corporate representative, Denha does not know whether Wireless Vision conducted an investigation or talked with Anthony Sawa to ensure that business in his store was ethical and legal.  Id. at 36:9-14, 43:3-6.  If HR conducted an investigation, it would have interviewed the alleged wrongdoer, i.e.

-12-

Naas, and that person's supervisor, i.e. Anthony Sawa.  No one from Wireless Vision or T-Mobile

contacted Naas, Anthony Sawa or Rodriguez as part of any such investigation.[12]

Wireless Vision strives to maintain a good reputation for integrity.  Its employee handbook

is intended to communicate company expectations to employees and ensure that employees are

following the law.  In part, the handbook states, as follows:

> All employees, including management staff, are responsible for promptly reporting
> to their supervisors actual or potential wrongdoing, including actual or potential
> violation of laws, regulations, policies or procedures.
>
> Employees who, in good faith, report a possible violation of law, regulation, policy
> or procedure will not be subjected to retaliation, retribution or harassment.  All
> managers should take measures to encourage the reporting of problems.  No manager
> or employee is permitted to engage in retaliation, retribution or any form of
> harassment against an employee for reporting compliance-related concerns.  Any
> manager or employee who conducts or condones retaliation, retribution or
> harassment in any way will be subject to disciplinary action up and including
> termination.   * * *
>
> Knowledge of actual or potential wrongdoing, misconduct or violations of policy
> must be immediately reported to management.  If, for any reason, any employee does
> not feel comfortable in reporting to his or her immediate supervisor or manager, he
> or she should report to a higher level supervisor or manager of the Company,
> including without limitation, the Human Resources Department at corporate
> headquarters.
>
> Managers will receive all employee concerns, problems and opinions and will
> explore suggestions regarding resolution of the issue.  They will work with the
> Company's Human Resources Department, as required.

Employee Handbook ¶ 7.3, Exhibit 3 to Defendant's Reply (Doc. #77).  If an employee is

uncomfortable reporting to his or her immediate supervisor, he or she may report higher up the chain

of command.

_____

[12]        Anthony Sawa first learned of the hotline complaint at his deposition on January 27,
2016.

Wireless Vision set goals for 80 to 90 per cent of its customers to subscribe to Jump. Wireless Vision displayed the goals on its intranet site and measured the Jump metric by all markets and all stores to determine the attachment rate.  Deposition of Mark Denha at 58:3-6, Exhibit 8 to Plaintiff's Response (Doc. #75).  During the time that Gust worked there, the Overland Park store was under its target percentage for Jump customers.  Deposition of Jordan Abeda at 29:15-23, Exhibit 2 to <u>Plaintiff's Response</u> (Doc. #75).  At the end of September, the store had an attachment rate of 78.83 per cent, <u>i.e.</u> just under 80 per cent.  By the end of October, the store had an attachment rate of 86.89 per cent.  The increased attachment rate from September to October was "significant." Denha Depo. at 60:9-21.

After his termination, Gust was unemployed for approximately five weeks.  He currently works as a drafter for Phelps Engineering.

**III.    Analysis**

Plaintiff asserts that defendant terminated his employment in violation of Kansas public policy, <u>i.e.</u> because he reported that Naas was instructing him and others to engage in deceptive consumer practices which violated the Kansas Consumer Protection Act ("KCPA"), K.S.A. § 50-623 <u>et seq.</u>  Defendant seeks summary judgment on grounds that plaintiff cannot establish a prima facie case or show that its reasons for termination are pretextual.

At-will employment is the general rule in Kansas.  <u>Flenker v. Willamette Indus., Inc.</u>, 266 Kan. 198, 200, 967 P.2d 295, 298 (1998).  Absent an express or implied contract of fixed duration, or where recognized public policy concerns are raised, employment is terminable at the will of either party.  <u>Frye v. IBP, Inc.</u>, 15 F. Supp.2d 1032, 1046 (D. Kan. 1998).  Kansas courts narrowly recognize at least two public policy exceptions to the rule of employment at will:

-14-

"(1) when an employer discharges an employee for exercising rights under the workers compensation laws and (2) when an employer discharges an employee for a good faith report or threat to report a serious infraction of rules, regulations, or law pertaining to the public health, safety, and the general welfare by a co-worker or employer (whistleblowing)."[13] Riddle v. Wal-Mart Stores, Inc., 27 Kan. App.2d 79, 85, 998 P.2d 114, 119 (2000). In Palmer v. Brown, 242 Kan. 893, 752 P.2d 685 (1988), the Kansas Supreme Court first announced the latter exception, which is commonly called the "whistleblower" exception. Under the whistleblower exception, an employer may not fire an employee because the employee has reported to company management or law enforcement serious legal violations by co-workers or the employer. See Koehler v. Hunter Care Ctrs., Inc., 6 F. Supp.2d 1237, 1241 (D. Kan. 1998) (citing Palmer, 242 Kan. 893, 752 P.2d 685).

To establish a prima facie case for retaliatory discharge under the whistleblower exception, plaintiff must show that (1) a reasonable person would have concluded that co-worker or company activities violated rules, regulations or laws pertaining to public health, safety and general welfare; (2) defendant knew that plaintiff had reported such a violation; and (3) defendant terminated plaintiff for making the report. Palmer, 242 Kan. at 900, 752 P.2d at 685. Also, plaintiff must show that he made the report in good faith, rather than out of a corrupt motive such as malice, spite, jealousy or personal gain, and that he reported the infraction to "company management or law enforcement officials." Id. If plaintiff establishes a prima facie case, the Court evaluates the claim under the

---

[13]     The Kansas Supreme Court has also recognized a public policy exception based on an employee's exercise of rights under the Federal Employers Liability Act ("FELA"), 45 U.S.C. § 51 et seq. See Hysten v. Burlington N. Santa Fe Ry. Co., 277 Kan. 551, 85 P.3d 1183 (2004), as modified, 277 Kan. 551, 108 P.3d 437 (2004). In so holding, the Kansas Supreme Court found that the public policy underlying FELA is identical to the public policy underlying the Kansas Workers Compensation Act, K.S.A. § 44-501 et seq. Id., 277 Kan. at 557, 563–64, 85 P.3d at 1187, 1191.

burden-shifting process set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).  <u>See</u>

<u>Rebarchek v. Farmers Co-op Elevator</u>, 272 Kan. 546, 553, 35 P.3d 892, 898 (2001); <u>White v.</u>

<u>Tomasic</u>, 31 Kan. App.2d 597, 601, 59 P.3d 208, 211 (2003).  Thus if plaintiff establishes a prima

facie case, the burden shifts to defendant to show that it terminated plaintiff for a legitimate reason,

at which point the burden shifts back to plaintiff to demonstrate that defendant's reason for

termination is pretextual.   <u>See</u> <u>Shaw v. Sw. Kan. Groundwater Mgmt. District Three</u>,

42 Kan. App.2d 994, 999, 219 P.3d 857, 862 (2009).

Plaintiff must prove his claim by "clear and convincing evidence."  <u>Goodman v. Wesley</u>

<u>Med. Ctr., LLC</u>, 276 Kan. 586, 589, 78 P.3d 817, 821 (2003).  Clear and convincing evidence is an

intermediate standard of proof which falls between a preponderance of the evidence and proof

beyond a reasonable doubt.  <u>In re B.D.-Y.</u>, 286 Kan. 686, 691, 187 P.3d 594, 598 (2008).  It requires

plaintiff to show that the truth of the facts asserted is "highly probable."  <u>Id.</u>, 286 Kan. at 696, 187

P.3d at 601.  In other words, plaintiff must convince the factfinder that based on all the evidence,

he has proven his factual allegations "to be true to a high probability."  <u>Id.</u>, 286 Kan. at 697, 187

P.3d at 602 (citation omitted).

### 1.    Prima Facie Case

Defendant asserts that plaintiff cannot establish a prima facie case of retaliatory discharge.

To establish a prima facie case, plaintiff must show by clear and convincing evidence that (1) a

reasonable person would have concluded that co-worker or company activities violated rules,

regulations or laws pertaining to public health, safety and general welfare; (2) defendant knew that

plaintiff had reported such a violation; and (3) defendant terminated plaintiff for making the report.

<u>Palmer</u>, 242 Kan. at 900, 752 P.2d at 685.  In addition, plaintiff must show that he made the report

in good faith and that he reported the infraction to company management or law enforcement officials. Id. Defendant asserts that plaintiff cannot show that (1) a reasonable person would have concluded that Naas engaged in conduct which violated the KCPA;[14] (2) plaintiff reported the alleged violation in good faith; or (3) defendant discharged plaintiff because he reported the alleged violation.

Defendant asserts that because plaintiff's allegations are based entirely on his subjective opinions, he cannot show that a reasonable person would have concluded that Naas engaged in conduct which violated the KCPA. See Defendant's Memorandum (Doc. #74) at 14. Defendant asserts that plaintiff's co-workers did not observe Naas engage in the alleged conduct and that Wireless Vision and T-Mobile investigated the allegations and determined that they were unfounded. See id. In ruling on defendant's motion for summary judgment, the Court construes the facts in the light most favorable to plaintiff. See Deepwater Invs., 938 F.2d at 1110. Plaintiff testified that Naas instructed him and other employees to add insurance on customer accounts without their consent and to ring up accessories without advising that it would result in additional costs per month. In addition, plaintiff testified that several customers complained that Wireless Vision had charged them

---

[14]      The KCPA protects consumers from suppliers who commit deceptive and unconscionable practices. K.S.A. § 50-623(b). More specifically, the KCPA makes it unlawful for a supplier to "engage in any deceptive act or practice in connection with a consumer transaction." K.S.A. § 50-626(a). "Supplier" means a "manufacturer, distributor, dealer, seller . . . or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions." K.S.A. § 50-624(l).

In this case, the Court has previously ruled that the KCPA is a law which pertains to "general welfare" within the scope of whistleblower protection under Kansas law. See Memorandum And Order (Doc. #13) at 9-10 (overruling defendant's motion to dismiss for failure to state claim). Defendant does not challenge the ruling here.

-17-

for insurance and/or accessories that they did not request. Gust Depo. at 104:11 to 105:20, 112-114.

Construing the evidence in the light most favorable to plaintiff, a jury could find by clear and

convincing evidence that Naas was instructing plaintiff and others to engage in deceptive consumer

practices which violated the KCPA. Defendant is not entitled to summary judgment on this ground.

Defendant asserts that plaintiff cannot show that he reported the alleged deceptive conduct

in good faith. Defendant asserts that instead, plaintiff made the report because of malice, spite or

jealousy. Specifically, defendant states as follows:

> The evidence in the case establishes that plaintiff disliked "bundled sales," that he
> was not good at this form of sales presentation, and that he eventually quit making
> these presentations to customers (SOF 18-19). Plaintiff's disillusionment and
> bitterness over Wireless policies and sales expectations manifested itself by plaintiff
> exhibiting a hostile, arrogant and know-it-all attitude, ignoring constructive advice,
> and being rude to customers and co-workers. (SOF 8-9, 11). In fact, plaintiff's
> feelings of malice, spite, or jealousy grew to such a degree that plaintiff even referred
> customers to Wireless' competitors. (SOF 10). Consequently, this evidence
> establishes that plaintiff reported the alleged violations of the KCPA because he
> disliked Wireless' policy of pushing "bundled sales" and was angry, jealous, or
> disillusioned that he was not meeting company expectations while other employees
> were doing so.

Defendant's Memorandum (Doc. #74) at 15. The fact that plaintiff may have expressed dislike for

bundled sales, demonstrated a bad attitude or referred customers to competitors does not

conclusively show that he reported the allegedly deceptive conduct in bad faith. At best, the record

presents a genuine issue of material fact in this regard. Defendant is not entitled to summary

judgment on this ground.

Defendant asserts that plaintiff cannot show a causal connection, i.e. that it fired him because

he reported the alleged unlawful conduct. As noted, on September 30, 2014, plaintiff reported

allegedly deceptive conduct by Naas to Anthony Sawa. Two days later, defendant terminated

plaintiff's employment. Protected activity closely followed by adverse action may justify an

-18-

inference of retaliatory motive.  See Marx v. Schnuck Mkts., Inc., 76 F.3d 324, 329 (10th Cir. 1996).

A two-day time span is more than sufficient in this regard.  See, e.g., Argo v. Blue Cross & Blue

Shield of Kan., Inc., 452 F.3d 1193, 1202 (10th Cir. 2006) (24 days sufficient to infer causal

connection).  Defendant is not entitled to summary judgment on this ground.[15]

### 2.    Pretext

Defendant asserts that plaintiff cannot show that its reasons for termination are

pretextual.  Defendant asserts that it terminated plaintiff because of poor work performance.

Specifically, defendant states as follows:

> [P]laintiff was a probationary employee.  He was routinely unsuccessful at closing
> "bundled sales," and he publicly expressed his dislike for making these presentations
> to customers.   Even though Wireless employees were expected to make "bundled
> sales" pitches to potential customers, plaintiff engaged in insubordination by
> eventually refusing to comply with this directive.  Plaintiff exhibited a know-it-all
> attitude, was rude or stand-offish with customers and coworkers, ignored advice or
> constructive criticism, and even referred customers to Wireless' competitors.  [Naas]
> noted these work-related deficiencies in the e-mail that he sent to . . . [Thomas]
> advising of his intent to terminate plaintiff's employment.

Defendant's Memorandum (Doc. #74) at 17 (record citations omitted).

Because defendant has articulated legitimate reasons for discharging plaintiff, the burden

shifts back to plaintiff to show that the stated reasons are a pretext for retaliation.  Plaintiff may do

so by producing evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a reasonable

factfinder could rationally find them unworthy of credence and hence infer that the employer did not

---

[15]    Defendant admits that the timing of plaintiff's termination appears to be "sufficient
to create an inference of retaliatory motive."  Defendant's Memorandum (Doc. #74) at 16.
Defendant nonetheless asserts that the facts of this case show that it fired plaintiff because of poor
work performance.  Id.  As discussed below, material fact issues exist in this regard.

-19-

act for the asserted non-discriminatory reasons."  Jones v. Okla. City Pub. Sch., 617 F.3d 1273, 1280 (10th Cir. 2010) (further citations omitted).  While this burden is not onerous, it is also not empty or perfunctory.  Morgan v. Hilti, Inc., 108 F.3d 1319, 1323-24 (10th Cir. 1997).  A plaintiff typically makes a showing of pretext in one of three ways: (1) evidence that defendant's stated reason for the adverse employment action is false, i.e. unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting plaintiff.  See Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000).  Evidence of pretext may include but is not limited to the employer's policy and practice regarding employment of members of the protected class (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating criteria); and use of subjective criteria.  Simms v. Okla. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1328 (10th Cir. 1999), overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).

Plaintiff asserts that timing of his termination is suspicious and that additional evidence casts doubt on the veracity of the stated reasons for termination.  See Plaintiff's Response (Doc. #75) at 46-59.  The two-day time span between plaintiff's report and termination certainly suggests a retaliatory motive, but temporal proximity standing alone is not sufficient to raise a genuine issue as to pretext.  See Pastran v. K-Mart Corp., 210 F.3d 1201, 1206 (10th Cir. 2000) (citations omitted).  Combined with other evidence of pretext, temporal proximity is a relevant factor which can help support such a finding.  See Zisumbo v. Ogden Reg'l Med. Ctr., 801 F.3d 1185, 1200 (10th Cir. 2015); Metzler v. Fed. Home Loan Bank of Topeka, 464 F.3d 1164, 1172 (10th Cir. 2006).  The

closer in time, the stronger the inference of pretext and improper intent.  See Ball v. Credit Bureau Servs., Inc., No. 111,144, 2015 WL 4366440, at *10 (Kan. App. June 26, 2015).

Here, plaintiff presents additional evidence of pretext.  Specifically, plaintiff points to lack of documentation and other inconsistencies regarding defendant's stated reasons for termination. See Plaintiff's Response (Doc. #75) at 50-56.  For instance, defendant states that it terminated plaintiff due to customer complaints, but Naas did not document even one customer complaint. Moreover, in response to plaintiff's interrogatory on this issue, defendant stated that "[t]here are no known complaints made by customers."  Defendant's Second Supplemental Answers To Plaintiff's First Interrogatories at 3 (answer to question 5), Exhibit 18 to Plaintiff's Response (Doc. #75).

Defendant claims that it terminated plaintiff because he referred customers to competitors, but it knows no facts which support its claim.  Moreover, although Wireless Vision expected a supervisor to discipline and document the behavior in question, especially if it happened more than once, Naas did not issue a single written discipline or otherwise document the behavior.

Naas claims that he discussed inappropriate behavior with plaintiff, but he did not document any warnings, discipline or negative behavior.  Naas said that he did not need do so because plaintiff was a probationary employee.  Wireless Vision policy, however, does not prevent supervisors from issuing written discipline to probationary employees.  Naas testified that he gave monthly written performance reviews, as required by company policy, to his employees.  Plaintiff worked under Naas for 52 days, but the record contains no written performance review for plaintiff.[16]

Thomas testified that before approving a termination, she ordinarily reviews all documents

---

[16]    As noted, plaintiff began work on August 11, 2014 and defendant fired him on October 2, 2014.

and circumstances to make sure that Wireless Vision has a basis for the action. In plaintiff's case, she only asked for his name and start date. Plaintiff's personnel file contains no record of verbal, written or final warnings.

Before October 1, Anthony Sawa and Naas did not discuss firing plaintiff. The day after he complained about deceptive consumer practices, they decided to terminate his employment. Although plaintiff still had 38 days remaining on his 90-day probationary period, it appears that they were suddenly in a hurry to discharge him. Given the timing, lack of documentation and inconsistencies with respect to defendant's practices and policies, a reasonable jury could easily find by clear and convincing evidence that defendant's stated reasons for termination are not only unworthy of belief but a pretext for retaliation. In other words, construed in the light most favorable to plaintiff, the record creates a genuine issue of material fact about the truth of defendant's stated reasons for discharge. Defendant is not entitled to summary judgment on plaintiff's retaliation claim.

**IT IS THEREFORE ORDERED** that Defendant's Motion For Summary Judgment (Doc. #73) filed March 9, 2016 be and hereby is **OVERRULED**.

Dated this 15th day of February, 2017 at Kansas City, Kansas.

s/  Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

-22-